## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITES STATES OF AMERICA and the STATE OF MARYLAND *ex rel.* ANTHONY C. CAMPOS<br><br>17800 Prettyboy Dam Rd<br>Parkton, Maryland 21120<br><br>Relator,<br><br>v.<br><br>THE JOHNS HOPKINS HEALTH SYSTEM CORPORATION,<br><br>600 N. Wolfe Street<br>Baltimore, Maryland 21205<br><br>Defendant. | Case No. _____<br><br>FEDERAL FALSE CLAIMS ACT COMPLAINT<br><br><br>JURY TRIAL DEMAND<br><br>**FILED IN CAMERA<br>AND UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. §3730 and<br>Md. Ann. Code, Gen. Provis. §8-104(3)(iii)**<br><br>**DO NOT ENTER INTO PACER**<br><br>**DO NOT ENTER IN CM/ECF**<br><br>**DO NOT PLACE IN PRESS BOX** |

# <u>FILED UNDER SEAL</u>

1

## PRELIMINARY STATEMENT

1.      This lawsuit is based on the acts and omissions, amounting to schemes, by the Defendant, The Johns Hopkins Health System Corporation ("Hopkins"), to defraud the United States and the State of Maryland.  Relator, through undersigned counsel, and acting on behalf of and in the name of the United States of America and the State of Maryland, brings this civil action under the *qui tam* provisions of the federal False Claims Act ("FCA"), 31 U.S.C. §§3729 *et seq.*, and the Maryland False Claims Act,  Maryland Annotated Code, Gen. Provis. §§8-101 *et seq.*

2.      There are two primary agreements that regulate the amount of revenue that Hopkins earns for services provided by its hospitals in Maryland.  The first agreement is the Maryland All Payer Model Agreement ("Model Agreement"), which is between the Centers for Medicare and Medicaid and the State of Maryland.  The second agreement is entitled "An Agreement Between the Health Service Cost Review Commission and the Johns Hopkins Health System Regarding Global Budget Revenue and Non-Global Budget Revenue" ("Global Budget Agreement").  The Global Budget Agreement is between Hopkins and the Health Service Cost Review Commission ("HSCRC"), acting on behalf of an under the authority of State of Maryland.  The agreements also establish the material requirements and conditions for payment and reimbursement for certain health care services provided.  Under these agreements, nearly all of the annual revenue for health care services rendered by Hopkins hospitals is established through a fixed annual amount.  One significant exception to this cap on annual revenue is for services provided by Hopkins to out-of-state patients.

3.      From December 2014 and continuing through the present, Hopkins has intentionally violated and deliberately circumvented material requirements and conditions for

payment and reimbursement under both the Model Agreement and the Global Budget Agreement. Hopkins has done so by implementing practices and procedures which improperly provide out-of-state patients priority access to health care services over Maryland residents. Hopkins' actions have resulted in out-of-state patients being provided preferential treatment without regard to clinical necessity, and to the detriment of Maryland residents.

4.     Out-of-state patients are not included as part of the capped fixed revenue that Hopkins earns under the Model Agreement and Global Budget Agreement. As a result, Hopkins provides preferential treatment and services to out-of-state patients as a way of boosting its overall revenue and profits. This preferential treatment for out-of-state patients violates the material requirements and conditions for payment set forth in both the Model Agreement and the Global Budget Agreement.

5.     Hopkins has deliberately withheld information regarding its noncompliance with the material requirements and conditions for payment established by these agreements from the federal government and the State of Maryland. In addition, Hopkins has taken deliberate steps to conceal its practices of providing out-of-state residents preferential treatment in order to evade detection. In doing so, Hopkins has made false certifications that it has met the material requirements and conditions of payment set forth in the Model Agreement and the Global Budget Agreement, as well as the Social Security Act, 42 U.S.C. § 1395f(a)(3). Hopkins' actions constitute violations of the Federal False Claims Act and the Maryland False Claims Act.

**PARTIES**

6.     Relator Anthony C. Campos is a citizen of the United States and a resident of the State of Maryland.  Mr. Campos was employed by Hopkins as the Director of Patient Access Operations from December 2011 through January 31, 2017.  During his tenure, Relator oversaw the operations of the Department of Patient Access, which included a twenty-five person team made up of operations analysts, operations and call center managers, and each of the patient access managers of approximately eighteen (18) medical departments within Hopkins.  Relator was also responsible for the management and operation of a 370-person Patient Access call center, which was responsible for scheduling patients for all appointments throughout the Hopkins medical system.  As the Director of Patient Access Operations, Relator was directly responsible for the overall performance of the call center, including developing and implementing practices and procedures of the call center established by Hopkins to govern all patients' access to health care services and treatments delivered by Hopkins.

7.     Relator believes that there has been no public disclosure of the particular allegations set forth in this Complaint.

8.     Relator is an original source of the facts and information set forth in this case concerning the activities of Hopkins.  The facts averred herein are based upon his personal observations, experiences, communications with Hopkins employees and officials and documents in his possession.

9.     Relator has provided the United States Attorney a full disclosure of substantially all material facts and documents in his possession, as required by the False Claims Act, 31 U.S.C § 3730(b)(2).

4

10.     Relator has also provided the Maryland Attorney General with a full disclosure of substantially all material facts and documents in his possession, as required by the Maryland False Claims Act § 8-104 (a)(3)(i).

11.     Defendant Hopkins is a corporation that was created in 1986 under the laws of Maryland.  Hopkins principal place of business is 600 N. Wolfe Street, Baltimore, Maryland 21205. Hopkins' subsidiaries include, but are not limited to, the Johns Hopkins Hospital, the Johns Hopkins Bayview Medical Center, Howard County General Hospital, and Suburban Hospital (the "Hopkins Subsidiaries").

12.     Any and all acts alleged herein to have been committed by Hopkins were committed by Hopkins and/or the Hopkins Subsidiaries' officers, directors, employees, representatives or agents (other than the Relator), who at all times acted on behalf of Hopkins and within the scope of their employment, and are collectively referred to herein as Hopkins.

## JURISDICTION AND VENUE

13.     This lawsuit is brought against the Defendant under the False Claims Act, 31 U.S.C. §§ 3729-3733 and the Maryland False Claims Act, Maryland Annotated Code, Gen. Provis. §§ 8-101 *et seq*.

14.     Jurisdiction over this action is conferred upon this Court by the Federal False Claims Act, 31 U.S.C. § 3732(a)-(b), which includes claims brought under state law for the recovery of funds paid by the State arising out of the same transaction or occurrence giving rise to the federal claims.

15.     This Court has jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a) and because Defendant is a Maryland corporation and transacts business throughout the state of Maryland.

16.     Venue is also proper pursuant to 31 U.S.C. § 3732(a), and because Defendant is a Maryland corporation and transacts business throughout the State of Maryland, and in particular, in Baltimore City.

## FACTS

**A.     The Model Agreement**

17.     On or about February 11, 2014, the Centers for Medicare and Medicaid ("CMS") and the State of Maryland entered into the Maryland All-Payer Model Agreement ("Model Agreement"). *See* **Exhibit 1**.

18.     The Model Agreement establishes how regulated Maryland hospitals, including Hopkins and the Hopkins Subsidiaries, are reimbursed for services by CMS and the State of Maryland through Medicare and Maryland Medicaid.

19.     The Model Agreement required Maryland to limit total annual hospital spending growth to 3.58% and to generate at least $330 million in total savings over five years.  To achieve this, the Model Agreement required Maryland to shift at least 80% of hospital "Regulated Revenue" to population-based payment structures by 2018.  Regulated Revenue is revenue earned by regulated Maryland hospitals for which the State has the legal authority to set payment rates and for which CMS has agreed to reimburse on the basis of the set rates under the Model Agreement.

20.     The primary purpose of the Model Agreement is to limit hospital spending growth while maintaining or increasing the quality of care for Medicare and Medicaid beneficiaries who reside in the State of Maryland.  Specifically, the Model Agreement emphasizes state-specific population health outcomes.

6

**B.     The Global Budget Agreement**

21.     Pursuant to the Model Agreement, Maryland's Health Services Cost Review Commission ("HSCRC"), the agency authorized to set hospital rates in the State of Maryland, has followed a Global Budget Revenue ("GBR") Model.  Under the GBR Model, an annual budget cap for each hospital in Maryland is pre-established so that each hospital's annual revenue from providing hospital services to Maryland residents is known at the beginning of each fiscal year, regardless of the number of Maryland residents actually treated or the amount of services actually delivered.

22.     On July 14, 2014, the HSCRC entered into an agreement with Hopkins (hereinafter "Global Budget Agreement"), wherein Hopkins agreed to the GBR Model.  *See* **Exhibit 2**.  Specifically, the Global Budget Agreement establishes Hopkins's annual budget cap, or GBR Regulated Revenue, based on Hopkins's historic volumes, costs, and patterns of hospital services.

23.     The GBR Regulated Revenue cap applies only to heath care services provided to Maryland residents.  Health care revenue for services provided to out-of-state residents is not counted as GBR Regulated Revenue.  Accordingly, any and all revenue earned by Hopkins for hospital services provided to out-of-state patients increases Hopkins' overall revenue beyond the capped amount it receives for GBR Regulated Revenue.  *See* **Exhibit 2**, at Appendix B.

24.     The Global Revenue Agreement assures Hopkins that it "will receive an agreed-on amount of revenue each year . . . regardless of the number of Maryland residents they treat and the amount of services they deliver provided that they meet their obligations to serve the health care needs of their communities in an efficient, high quality manner on an ongoing basis." *See* **Exhibit 2** at p. 3.

25.     Two material requirements of the Model Agreement, also incorporated into the Global Budget Agreement, are that (1) Hopkins operate within the "GBR's financial constraints and to comply with the various patient-centered and population-focused performance standards," and (2) that Hopkins refrain from "deliberate efforts by the Hospital to deny, for inappropriate financial reasons, any services to particular patients . . . ." *See* **Exhibit 2**, at pp. 4 and 10.

26.     Significantly, the Global Budget Agreement expressly contemplates that an increase of the Hopkins's out-of-state Non-GBR Regulated Revenue would have a negative effect on the success of the GBR Model and that such increases would undermine the Model Agreement. *See* **Exhibit 2**, at p. 14.

**C.     Hopkins Begins "Filling the Plane" With the "*Right Kind* of Travelers"**

27.     From the start of Relator's employment, Hopkins had tasked the Department of Patient Access with "filling the plane," a metaphor for completely filling Hopkins's hospital schedule with patients just as airlines strive to completely fill their planes with passengers before flying across the country.  The initiative to "fill the plane" was vigorously enforced by Hopkins's senior management, including Hopkins's president, Ronald Peterson, and Hopkins's chief financial officers, including Ronald Werthman, the signatory of the Global Budget Agreement, as a way of achieving profit targets.

28.     Beginning in or about December 2014, following the execution of the Model Agreement and the Global Budget Agreement, Hopkins's senior management first began contemplating a shift in the focus of the initiative from simply scheduling as many patients as possible to filling the plane with the "right kind of travelers," or as many out-of-state patients as possible.

29.     Hopkins first began pushing this newly-focused initiative on or about January 31, 2015, which is marked by an e-mail, of which Relator has personal knowledge.  The e-mail was

8

sent by President Peterson to Relator's supervisor and Senior Director of the Department of

Patient Access to address his concerns related to the decreased volume of financially lucrative in-

patient admissions. Hopkins's in-patient admission volumes are driven by out-patient specialty

appointments, which often include specialty consultations, which lead ultimately to in-patient

admissions for specialty surgeries or treatments.

30.     On January 31, 2015, Relator's supervisor held a conference call with Relator and

two other supervisors in the Department of Patient Access and instructed them to develop and

make necessary changes to the scheduling strategies of the department that would increase out-

of-state activity in the interest of increasing in-patient volume. Relator's supervisor advised

Relator that during the call, the request to focus on increasing out-of-state patient services was

coming from Hopkins's senior management.

31.     After January 31, 2015, Relator was frequently reminded by his supervisor and

other members of Hopkins's senior management that Hopkins was striving to fill the plane with

"out-of-state travelers" in order to increase revenue in light of the GBR Regulated Revenue

limits established by the HSCRC pursuant to the Model Agreement and the Global Budget

Agreement.

32.     In early February 2015, Relator told his supervisor that his team received

complaints and concerns from doctors and medical office coordinators about the prioritization of

out-of-state patients. In response, Relator's supervisor advised Relator that senior management

had specifically asked the Department of Patient Access to implement out-of-state prioritization

and therefore, the department was required to do it.

9

33.     Beginning in February or March of 2015, Relator also attended quarterly meetings with senior management, wherein these concerns were expressed by a doctor to President Peterson and Mr. Werthman, who did not respond to those concerns.

34.     From the Winter through the Spring of 2015, Relator's supervisor increasingly emphasized to Relator that she wanted the Department of Patient Access to prioritize out-of-state patients over in-state patients and instructed Relator and his team to give out-of-state patients priority when scheduling their appointments. Relator's supervisor made it clear to Relator that the prioritization of out-of-state patients was coming from senior management and that the Department of Patient Access was required to implement the request.

35.     Pursuant to the orders of Hopkins senior management, the Department of Patient Access began implementing practices and procedures which gave out-of-state patients priority access to appointments for specialty services and treatments. The purpose of the priority services was to enhance Hopkins revenue through lucrative in-patient services provided to out-of-state patients, which did not count against the cap on revenue under the Model Agreement or the Global Budget Agreement.

36.     From the Spring of 2015 until Relator separated from Hopkins, Relator's supervisor held weekly meetings with the directors of the Department of Patient Access which took place every Wednesday or Thursday at 7:30 a.m., to discuss Hopkins's new-initiative to prioritize the scheduling and treatment of out-of-state patients. At each of these meetings, Relator's supervisor emphasized that the goal of Hopkins and its senior management was to fill the hospital schedule with as many out-of-state patients as possible. During these meetings, it was repeatedly highlighted that this initiative was critical to Hopkins's profits because in-state patients were subject to revenue limits and out-of-state patients were not.

37.     Additionally, during the Spring of 2015, Relator attended quarterly meetings between the Patient Access Leadership Team, which included several senior doctors, and Hopkins's senior management, including President Peterson and Mr. Werthmann.  The primary topic of discussion at each of these meetings was the progress of the Patient Access Team in its efforts to prioritize out-of-state patients over in-state patients.  During these quarterly meetings, Hopkins senior management frequently discussed implementing strategies to prioritize services to out-of-state patients and emphasized that the initiative was critical to meeting revenue goals.  In these meetings, it was openly discussed that priority was being given to out-of-state patients in order to drive Hopkins's profits because in-state patients were subject to the global revenue cap, but out-of-state patients were not.

38.     As of early 2015, Hopkins knowingly and intentionally engaged in an scheme to increase annual revenue and profit by giving out-of-state residents priority and preferential treatment in scheduling and receiving medical services and treatments by Hopkins, without regard to clinical necessity, requirements or urgency.  These actions violated the material requirements of the Model Agreement and Global Budget Agreement, which were conditions for payment and/or reimbursement by Medicare and Maryland Medicaid.

**D.     Hopkins's Processes and Procedures Implemented in Furtherance of the Scheme**

39.     Beginning in late Spring or early Summer of 2015 and continuing until Spring of 2016, Hopkins began implementing a process by which out-of-state patients who contacted the Patient Access call center seeking an appointment were automatically transferred to Johns Hopkins USA.  Johns Hopkins USA is medical concierge service that helps patients outside of Maryland seeking specialty treatment at Hopkins find accommodations in Maryland during their treatment.  During this time, however, Hopkins tasked Johns Hopkins USA with assisting out-

of-state patients who were seeking appointments throughout the hospital system.  The goal at this time was to change the culture within Hopkins and promote the idea that special attention was to be paid to out-of-state patients because of their profitability to Hopkins.  The Hopkins USA effort was overseen by Relator and the Department of Patient Access, as well as Hopkins USA leadership.  Ultimately, the effort failed.

40.     In the Spring of 2016, Hopkins eliminated Hopkins USA from the scheduling process.  In its place, Hopkins required that all departments adopt an escalation policy to assist with access for domestic out-of-state patients.  Specifically, Hopkins requested that all domestic out-of-state patients, regardless of clinical urgency or necessity, be offered an appointment within thirty (30) days of contact.  Relator and his operations team were responsible for implementing each department's escalation policy through the Patient Access call center.

41.     The most profitable departments, or those with high rates of inpatient admission and treatment, were the primary targets of the scheme.

42.      On or before April 28, 2016, Hopkins targeted the following departments to implement a specific out-of-state inpatient escalation process for the following services:

a. Neurosurgery: Brain Tumor, Spine, Neurovascular, Functional Neurosurgery, Hydrocephalus, Pediatric Neurosurgery, Pituitary Tumors and Spinal Tumors;

b. Oncology: In-patient/out-patient Bone Marrow Transplant;

c. Otolaryngology: Cochlear Implants and Acoustic Neuromas;

d. Pediatrics: Oncology, Surgical Specialties, Intestinal Rehabilitation/Short Bowel Program, Fetal Surgery, Pectus Excavatum;

e. Surgery: Aortic Surgery; Pancreatic and Liver Cancer Surgery; Esophageal and Lung Cancer, Liver Transplants, and Endovascular Aneurysm Therapy.

43.     On or before April 29, 2016, Relator has personal knowledge that as a result of the directive to prioritize out-of-state patient services, the Department of Otolaryngology – Head and Neck Surgery, updated its "Domestic Out of State protocol," so that out-of-state Acoustic Neuroma patients were required to be provided an appointment within thirty (30) days of their request, whereas the same categories of in-state patients were to be given an appointment within six (6) weeks.  If an appointment for an out-of-state patient could not be scheduled within thirty (30) days, the protocol provided that a supervisor or department administrator needed to get involved to ensure an appointment was provided within the time period.  Hopkins did not have a similar policy of involving a supervisor for in-state patients who could not be scheduled in six (6) weeks.

44.     Upon Relator's information and belief, as a result of this directive, the scheduling protocol for out-of-state patients was similarly updated by the Neurosurgery, Oncology, Pediatrics, and Surgery departments.

45.     The primary discussion of several of the weekly Patient Access departmental meetings was the implementation of these department-specific out-of-state escalation policies. Relator has personal knowledge that those meetings, in addition to others, took place on the following dates: May 5, 2016, June 2, 2016, June 9, 2016, June 16, 2016, August 22, 2016, and October 11, 2016.

46.     As in all other departmental meetings, Relator's supervisor explained in these meetings that the escalation policies were being implemented as part of Hopkins's intent to prioritize hospital services delivered to out-of-state patients and that these policies were necessary to achieve Hopkins's revenue and profit goals because in-state patients were subject to revenue limits and out-of-state patients were not.

47.     On May 18, 2016, the Armstrong Institute for Patient Safety and Quality, a division within Hopkins, held an Executive Council meeting wherein seven "Mission Imperatives" for Fiscal Year 2017 were discussed. The meeting was called specifically to discuss strategies in response to overcome barriers to Hopkins's operational and financial success caused by the GBR Regulated Revenue.   At the meeting, it was emphasized that failure to address these barriers could lead to significant financial losses.

48.     The Executive Council's Mission Imperatives I and III were established to increase capacity for out-of-state cases and to increase the number of out-of-state patients.  Some of the objectives established by Hopkins's Executive Council were to:

    a.  Dedicate appointments and block time for out-of-state patients;

    b.  Give priority to out-of-state patients for appointment slots and/or operating room and procedure time;

    c.  Target areas with high out-of-state potential within the palliative care program;

    d.  Evaluate and optimize current processes for intake and scheduling of domestic out-of-state patients to increase the conversion rate of inquiring patients;

    e.  Ensure that 100% of domestic out-of-state patients receive financial clearance;

    f.  Achieve proper management of potential out-of-state patients to ensure timely appointments or admissions are provided;

    g.  Support the interests of physicians to treat more domestic out-of-state patients, similar to what is done for international patients; and

    h.  Increase the number of out-of-state patients seeking care at Hopkins.

49.     On May 21, 2016, the Department of Patient Access received an update issued by the Armstrong Institute for Patient Safety and Quality describing Hopkins's efforts to increase

the number of out-of-state patients.  Through the update, Hopkins advised the Department that 250-350 additional out-of-state cases were needed in order to reach profit targets of between $5,000,000 (five million dollars) and $7,000,000.00 (seven million dollars).  Service lines with the highest profit margin were also identified, which specifically included patients with brain tumors, liver cancer, neurovascular issues, pancreatic cancer, and spine tumors.  The primary purpose of this update was to impress upon the Department of Patient Access that not only should out-of-state and international patients receive priority access to the health services, but that a premium should be placed on out-of-state patients suffering from these more profitable conditions.

50.     As of July 1, 2016, Hopkins expanded its out-of-state escalation scheme by creating a waitlist priority setting in EPIC, the software used by Patient Access to schedule appointments throughout Hopkins, whereby patients would be notified if an earlier appointment became available.  Relator has personal knowledge that schedulers working in the Patient Access call center were instructed to assign a priority status to patients who were added to a waitlist. Specifically, pursuant to the protocol, schedulers were instructed to assign in-state residents "Low Priority" and out-of-state patients "Normal Priority."  Schedulers were instructed to assigned patients "High Priority" only if the patient specifically told the scheduler that he or she had a "confirmed urgent diagnosis."

51.     Pursuant to the scheme, priority levels for out-of-state patients and most in-state patients were assigned without regard to clinical urgency or necessity.  The schedulers working in the Patient Access call center were not qualified to make a clinical determination in the assignment of priority levels, and the EPIC system did not provide the scheduler with a mechanism to assess clinical necessity, requirements or urgency.  The result of this improper

prioritization scheme was that Hopkins improperly provided non-Maryland residents priority to medical treatment over Maryland residents. For example, a Maryland resident who called in with extreme head pain that was ongoing for three days would be assigned "Low Priority," and a Pennsylvania resident who called in with a headache would receive "Normal Priority." Ultimately, the Pennsylvania resident would be eligible to receive an earlier appointment before the Maryland resident, not based on clinical necessity, requirements or urgency, but based exclusively on having a financially beneficial out-of-state residency status.

52.     By way of further illustration, on August 5, 2016, as a result of the waitlist priority scheme, out of 100 patients on the surgery department's waitlist, 62 were "Normal Priority" out-of-state residents, 33 were "Low Priority" in-state residents, and only 5 were "High Priority" patients. Relator has personal knowledge that other clinical departments had similar waitlists.

53.     As of August 5, 2016, pursuant to Hopkins's mandate, the surgery department was actively working to utilize the waitlist to identify out-of-state patients and working to maximize provider utilization for these patients.

54.     As of August 22, 2016, the Department of Patient Access created designated out-of-state appointment blocks in clinical departments to maximize scheduling capacity and availability for out-of-state patients. In addition to this, the Department of Patient Access was distributing daily out-of-state appointment lag reports to clinical departments to review and identify opportunities to move out-of-state patients to an earlier appointment time. By this time, the Department of Patient Access had finalized a formal escalation process for each of Hopkins's clinical departments to accommodate and prioritize out-of-state patients.

55.     Upon Relator's information and belief, Hopkins has continued to carry out its improper processes and procedures that give priority access to out-of-state patients to the detriment of in-state patients to the present day.

**E.      Hopkins' Violations of the Material Requirements and Conditions of Payment of the Model Agreement and the Global Budget Agreement.**

56.     By prioritizing healthcare services to and treatment of out-of-state patients, Hopkins has increased the number of services and the number of patients for which it receives revenue outside of its GBR Regulated Revenue.

57.     Hopkins's prioritization of health care services and treatments of out-of-state patients has not only had a negative impact on Maryland residents' access to quality and affordable health care, it has also decreased the number of patients served and treatments provided to Maryland residents for which Hopkins receives GBR Regulated Revenue.

58.     Hopkins's deliberate prioritization of health care services and treatments of out-of-state patients to intentionally increase revenue outside the GBR Regulated Revenue, and to decrease the number of patients served and treatments provided to Maryland residents for which it receives GBR Regulated Revenue, amounts to non-compliance with the material requirements and conditions of payment of the Model Agreement and Global Budget Agreement.

59.     By deliberately prioritizing health care services and treatments of out-of-state patients, Hopkins has failed to operate within the GBR's financial constraints in violation of the material requirements and conditions of payment of the Model Agreement and the Global Budget Agreement.

60.     By deliberately prioritizing health care services and treatments of out-of-state patients, Hopkins has failed to comply with patient-centered and population focused performance

standards in violation of the material requirements and conditions of payment of the Model

Agreement and the Global Budget Agreement.

61.     By deliberately prioritizing health care services and treatments of out-of-state

patients, Hopkins has denied, for inappropriate financial reasons, services and treatments to

Maryland patients in violation of the material requirements and conditions of payment of the

Model Agreement and the Global Budget Agreement.

62.     Hopkins has knowingly and deliberately failed to disclose these practices and

procedures to the United States government and its agencies, including the Centers for Medicare

and Medicaid, the State of Maryland and its agencies, including the Heath Service Cost Review

Commission, and has continued to receive GBR Regulated Revenue pursuant to the Model

Agreement and Global Budget Agreement, despite its non-compliance and violations of the

material requirements of both agreements and its deliberate acts to conceal these violations.

63.     Hopkins's knowing and deliberate failure to disclose these practices amounts to a

false or fraudulent implied representations and/or certifications that it has complied with the

material requirements and conditions for payment of the Model Agreement and Global Budget

Agreement.

**F.     Additional Evidence of Hopkins' Deliberate Efforts to Conceal Violations of the
         Material Requirements and Conditions of Payment of the Model Agreement and the
         Global Budget Agreement.**

64.     The Global Budget Agreement recognized that manipulation of services provided

to out-of-state residents by Hopkins could serve to "negatively affect the success of the GBR

Model." The Global Budget Agreement put in place certain measures to ensure that "the GBR

model and the final contract between CMMI and the State of Maryland are not being undermined

by such changes" in revenue derived from out of state patients. At the time the Global Budget

Agreement was executed, approximately 18% of Hopkins' revenue was derived out of state patient services.   The overall total revenue for out-of-state services was approximately $590 million.   *See* **Exhibit 2**, Global Budget Agreement, at p. 14.

65.     Under the Model Agreement, the State of Maryland was required to establish procedures to monitor the Regulated Maryland Hospitals.  These monitoring procedures included the requirement that the State and CMS would calculate "the percentage of Medicare hospital revenue attributable to non-resident Medicare beneficiaries."  **Exhibit 1**, Model Agreement, at p. 16.  The Model Agreement established that if the Regulated Hospital experienced a 1.5% increase over the revenue from the prior year's services rendered to out-of-state patients, the State would be required to "provide a review of the causes of such increases."  *Id.*  The State is also required under the Model Agreement to monitor and report on "deviations from standard business practices" related to increased services for out-of-state resident.  *Id.*

66.     Hopkins was aware of these threshold levels of increases in out-of-state revenue that would trigger monitoring, reviews and reporting requirements.  *See id.*; **Exhibit 2**, at p. 11 ("The HSCRC may request data from [Hopkins] . . . to ensure that [Hopkins] complies with the GBR constraint through better management of its existing regulated services, and not by moving services . . . in ways that do not comport with the objectives of the GBR model . . . [or the Model Agreement.]").  Given the overall base level of $590 million for out-of-state services reflected in the Global Budget Agreement, an increase in services to out-of-state residents by more than $8.85 million would likely result in review and scrutiny by the State based on these monitoring and reporting obligations.  Hopkins carefully and specifically designed its programs and targeted revenue goals to increase its profits to fall under the 1.5% threshold to evade detection.  *See* **Exhibit 1**, Model Agreement, at p. 16.

67.     For example, in establishing its Fiscal Year 2017 Mission Imperatives, Hopkins specifically determined that it needed to increase the number of out-of-state patient cases by between 250 and 300 cases.  Based on this targeted increase in out-of-state cases, Hopkins determined that it would meet its targeted profit increase for out of state revenue of between $5 million and $7 million. This profit goal, even if modestly exceeded, would allow Hopkins to maximize its profits through its improper prioritization of out-of-state patients, but avoid scrutiny and detection by the state and federal regulators because it would not reach the threshold amount of $8.85 million, which would have triggered reporting requirements, auditing and scrutiny by regulators.

## COUNT ONE
## FALSE CLAIMS RELATED TO FRAUDULENT MISREPRESENTATION OF CONTRACT VIOLATIONS IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT

68.     Relator re-alleges and incorporates the allegations in paragraph 1-67 as is fully set forth herein.

69.     By fraudulently misrepresenting its compliance with the material requirements and conditions for payment set forth in the Model Agreement and/or the Global Budget Agreement, at all times relevant to this Complaint, Hopkins knowingly presented false or fraudulent claims for payment, approval, credit or reimbursement and used or caused to be used false records or statement materials to present such false or fraudulent claims in violation of 31 U.S.C. §3729(a)(1)(A) and (B).

70.     Specifically, at all times relevant to this Complaint, each time Hopkins submitted a claim for Medicare and/or Medicaid payment, approval, credit or reimbursement for hospital services, Hopkins made an false or fraudulent implied representation that the services were

provided pursuant to the material requirements and conditions for payment set forth in the Model

Agreement and Global Budget Agreement in violation of 31 U.S.C. §3729(a)(1)(A) and (B).

**COUNT TWO**
**FALSE CLAIMS FOR MEDICALLY UNNECESSARY**
**SERVICES IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT**

71.     Relator re-alleges and incorporates the allegations in paragraph 1-70 as if fully set

forth herein.

72.     42 U.S.C. § 1395f(a)(3) conditions payment by Medicare for inpatient hospital

services upon a certification that the services are required to be given on an in-patient basis for

such individual's medical treatment or that inpatient diagnostic study is required and such

services are necessary for such purpose.

73.     By prioritizing the services and treatments provided to out-of-state patients, to the

detriment of Maryland residents, without regard for clinical necessity, requirements or urgency,

at all times relevant to this Complaint, Hopkins was not providing medically necessary or

medically required inpatient hospital services in the ordinary clinical course.

74.     Instead, Hopkins was providing inpatient hospital services based on residency

status and improper profitability factors expressly forbidden by the underlying agreements.  As a

result, some in-patient hospital services were provided to patients whose medical need or

requirements had not matured.

75.     Accordingly, at all times relevant to this Complaint, Hopkins made false or

fraudulent implied representations that its inpatient hospital services were provided pursuant to

requirements and conditions for payment set forth in 42 U.S.C. § 1395f(a)(3) in violation of 31

U.S.C. §3729(a)(1)(A) and (B).

## COUNT THREE
## FALSE CLAIMS RELATED TO
## FRAUDULENT MISREPRESENTATION OF CONTRACT
## VIOLATIONS IN VIOLATION OF THE MARYLAND FALSE CLAIMS ACT

76.     Relator re-alleges and incorporates the allegations in paragraph 1-75 as if fully set forth herein.

77.     By fraudulently misrepresenting its compliance with the material requirements and conditions for payment set forth in the Model Agreement and/or the Global Budget Agreement, at all times relevant to this Complaint, Hopkins knowingly presented false or fraudulent claims for payment, approval, credit or reimbursement and used or caused to be used false records or statement materials to present such false or fraudulent claims in violation of Maryland Annotated Code, Gen. Provis. § 8-102(b)(1) and (2).

78.     Specifically, at all times relevant to this Complaint, each time Hopkins submitted a claim for Medicare and/or Medicaid payment, approval, credit or reimbursement for hospital services, Hopkins made a false or fraudulent implied representation that the services were provided pursuant to the material requirements and conditions for payment set forth in the Model Agreement and Global Budget Agreement in violation of Maryland Annotated Code, Gen. Provis. § 8-102(b)(1) and (2).

**PRAYER FOR RELIEF**

Relator respectfully requests that this Court enter judgment against Hopkins as follows:

(a) That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaints, as the Federal False Claims Act, 31 U.S.C. § 3729 provides;

(b) That the State of Maryland be awarded damages in the amount of three times the damages sustained by the State because of the false claims and fraud alleged within this Complaint, as the Maryland False Claims Act, § 8-102(c) provides;

(c) That civil penalties of $10,000.00 be imposed for each and every false claim Hopkins presented to the United States;

(d) That civil penalties of $10,000.00 be imposed for each and every false claim Hopkins presented to the State of Maryland;

(e) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pressing this case pursuant the False Claims Act, 31 U.S.C. §3730(d) and the Maryland False Claims Act, §8-105;

(f) That the Court grant permanent injunctive relief to prevent any recurrence of violations of the Federal False Claims Act for which redress is sought in this Complaint;

(g) That Relator be awarded the maximum percentage of any recovery allowed to him pursuant the Federal False Claims Act, 31 U.S.C. §3730(d) and the Maryland False Claims Act, §8-105; and

(h) That this Court award such other and further relief as it deems just and proper.

Dated: July 31st, 2017

_____
Anthony M. Conti (Fed. Bar #26007)
Lindsey Ann Thomas (Fed. Bar #16163)
Conti Fenn & Lawrence LLC
36 South Charles Street, Suite 2501
Baltimore, Maryland 21201
Phone (410) 837-6999
Facsimile (410) 510-1647
tony@lawcfl.com
lindseyann@lawcfl.com

## **DEMAND FOR JURY TRIAL**

Relator, on behalf of himself, the United States of America and the State of Maryland,

demands a jury trial on all claims alleged herein.

_____
Anthony M. Conti (Fed. Bar #26007)
Lindsey Ann Thomas (Fed. Bar #16163)
Conti Fenn & Lawrence LLC
36 South Charles Street, Suite 2501
Baltimore, Maryland 21201
Phone (410) 837-6999
Facsimile (410) 510-1647
tony@lawcfl.com
lindseyann@lawcfl.com