IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA
ex rel. ANTHONY C. CAMPOS

v.   Civil No. CCB-17-2156

THE JOHNS HOPKINS HEALTH SYSTEM
CORPORATION

******

**MEMORANDUM**

Relator Anthony C. Campos ("Campos") brings this *qui tam* action under the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*, against defendant The Johns Hopkins Health System Corporation ("Hopkins"). Campos alleges Hopkins violated 31 U.S.C. § 3729(a)(1)(A) and (B) when it engaged in a scheme to prioritize out-of-state patients and then submitted claims to the federal government representing its compliance with contracts which, according to Campos, prohibited such a scheme. Now pending is Hopkins's motion to dismiss. For the reasons set forth below, Campos has failed to state a claim, and the motion will be granted.

**BACKGROUND**

At the motion to dismiss stage, this court accepts as true the facts alleged in the complaint. *See Aziz v. Alcolac*, 658 F.3d 388, 390 (4th Cir. 2001). Hopkins is a corporation created in 1986 under the laws of Maryland, which has multiple subsidiaries. ECF No. 10, ¶ 11. The subsidiaries relevant to this case are the Johns Hopkins Hospital, the Johns Hopkins Bayview Medical Center, Howard County General Hospital, and Suburban Hospital ("Hopkins

Subsidiaries"). *Id.* Campos was the Director of Patient Access Operations at Hopkins from December 2011 to January 2017. *Id.* at ¶ 6. In that capacity he oversaw a twenty-five person team of operations analysts, operations and call center managers, and patient access managers for approximately eighteen medical departments within Hopkins. *Id.* He also oversaw a three hundred and seventy person Patient Access call center, which was responsible for scheduling patients for all appointments throughout the Hopkins medical system. *Id.* Campos is the original source of the facts and information set forth in the complaint concerning Hopkins' activities. *Id.* at ¶ 8.

On February 11, 2014, the Centers for Medicare and Medicaid ("CMS") and the State of Maryland entered into the Maryland All-Payer Model Agreement ("Model Agreement"). ECF No. 10, ¶ 17. The Model Agreement establishes how regulated Maryland hospitals, including the Hopkins Subsidiaries, are reimbursed for services by CMS and the State of Maryland through Medicare and Maryland Medicaid. *Id.* Pursuant to the Model Agreement, Maryland's Health Services Cost Review Commission ("HSCRC"), the agency authorized to set hospital rates in Maryland, follows a Global Budget Revenue ("GBR") Model. *Id.* at ¶ 21. Under the GBR Model, an annual budget cap for each hospital in Maryland is pre-established so that each hospital's annual revenue from providing hospital services is known at the beginning of the fiscal year, regardless of the number of patients actually treated or the amount of services actually delivered. *Id.* The GBR Model was implemented pursuant to a provision of the Social Security Act which authorizes CMS to "test innovative payment and service delivery models that have the potential to reduce Medicare, Medicaid, or Children Health Insurance Program ("CHIP") expenditures while maintaining or improving the quality of care for beneficiaries." ECF No. 10-2, p. 1.

On July 14, 2014, the HSCRC and Hopkins entered into an agreement pursuant to the GBR Model (the "Global Budget Agreement"), which used Hopkins's past history regarding the volumes, costs, and patterns of its hospital services to establish Hopkins's annual budget cap. *Id.* at ¶ 22. Importantly, during the relevant time period, Hopkins's annual budget cap applied only to health care services provided to Maryland residents, *Id.* at ¶ 23, except that at Howard County General Hospital services provided to out-of-state patients were also included. ECF No. 10-3, p. 19. Revenue for services provided to out-of-state residents at any of Hopkins's other three hospitals was not counted towards the cap. *Id.* As a result, any revenue earned by Hopkins for such services increased Hopkins's overall revenue beyond the annual budget cap. *Id.*

Three provisions of the Global Budget Agreement are relevant for purposes of this case. First, a provision within the "Overview" section:

> In accepting this Agreement, each JHHS Hospital agrees to operate within the GBR's financial constraints and to comply with the various patient-centered and population-focused performance standards that have been or will be established by the HSCRC . . . . ECF No. 10-3, p. 4.

Second, a provision within a subsection of a section entitled "Monitoring of GBR Operation and Performance," entitled "Case Mix/Severity Levels":

> The HSCRC will pay close attention to the overall case mix and the severity levels within DRGs at each Hospital. If requested, the Hospital will demonstrate to the HSCRC that any reductions in its case mix index or its severity levels are not the result of deliberate efforts by the Hospital to deny, for inappropriate financial reasons, any services to particular patients, or treatments for particular conditions that fall within the scope of the medical capabilities of the Hospital and its attending medical staff. ECF No. 10-3, p. 10.

Third, a provision within a section entitled "Out-of-Area and Out-of-State Volumes and Revenues":

> Significant changes in out-of-state volume and volumes from outside an individual Hospital's PSA and SSA have the potential to positively or negatively affect the success of the GBR Model. In FY 2013, approximately 17.97 percent of

3

the Hospital System's total revenue came from non-Maryland residents. If this percentage changes materially during the term of this Agreement, the HSCRC staff and the Hospital will evaluate the causes of the change to ensure that the goals and objectives of this Agreement, the GBR model and the final contract between CMMI and the State of Maryland are not being undermined by such changes. ECF No. 10-3, p. 14.

Campos alleges that Hopkins violated these three provisions of the Global Budget Agreement when it engaged in a campaign to recruit out-of-state patients at the expense of in-state patients. This campaign was known as the campaign to "fill the plane with the right kind of travelers"—to completely fill Hopkins's hospital schedule, using as many out-of-state patients as possible. ECF No. 10, ¶¶ 27–28. Campos offers numerous details about this scheme. The most relevant are set forth below.

First, Hopkins's senior management initiated the campaign for the explicit purpose of increasing revenue, which Hopkins could do only by treating out-of-state patients who were not subject to the annual budget cap. *Id.* at ¶¶ 27–31, 34, 37.

Second, doctors expressed concern about this campaign but were ignored by senior management. *Id.* at ¶¶ 32–33.

Third, pursuant to the orders of Hopkins's senior management, the Department of Patient Access began implementing practices and procedures that gave out-of-state patients priority access to appointments. *Id.* at ¶¶ 35–37. Specifically, all domestic out-of-state patients were to be offered an appointment within thirty days, regardless of clinical urgency or necessity. *Id.* at ¶ 40. The Patient Access call center, which was responsible for ensuring this came to pass, was told to focus specifically on the most profitable departments. *Id.* at ¶¶ 40–41. Campos alleges personal knowledge that one of those departments, the Department of Otolaryngology, had a policy that if an out-of-state patient could not initially be scheduled within thirty days, a supervisor was to get involved to ensure that the appointment was provided within that time period. The department

4

had a policy of giving in-state patients an appointment within forty-two days, and there was no policy of involving a supervisor if an in-state patient could not be scheduled within that time period. *Id.* at ¶ 43. Campos believes that the scheduling protocol was the same in the Neurosurgery, Oncology, Pediatrics, and Surgery departments. *Id.* at ¶ 44.

Fourth, an Executive Committee convened in May 2016 to discuss how to increase revenue, and the Committee discussed how it could increase the percentage of out-of-state patients treated. *Id.* at ¶¶ 47–49. The Committee advised the Department of Patient Access that 250-350 additional out-of-state cases were needed in order to reach profit targets of between 5 and 7 million dollars, and identified those services with the highest profit margins for further targeting. *Id.* at ¶ 49.

Fifth, in July 2016, Hopkins created a waitlist priority setting in its internal scheduling software according to which in-state residents were assigned "Low Priority" and out-of-state patients were assigned "Normal Priority." *Id.* at ¶ 50. Only patients with an urgent diagnosis, regardless of residence, were assigned "High Priority." *Id.*

Sixth, in August 2016, the Department of Patient Access created designated out-of-state appointment blocks in clinical departments to maximize scheduling capacity and availability for out-of-state patients. *Id.* at ¶ 54. Campos alleges that these practices continue today. *Id.* at ¶ 55.

Campos alleges that this attempt to prioritize out-of-state patients had a negative impact on Maryland residents' access to quality and affordable health care and decreased the number of patients served and treatments provided to Maryland residents. *Id.* at ¶ 57. He alleges that the campaign amounted to (1) failure to operate within the GBR's financial constraints; (2) failure to comply with patient-centered and population focused performance standards; and (3) denial, for inappropriate financial reasons, of services and treatments to Maryland patients. *Id.* at ¶¶ 59–62.

As a result, he says, every time Hopkins impliedly represented or certified that it was complying with the material terms and conditions of the Model Agreement and Global Budget Agreement, such representation or certification was false or fraudulent. *Id.* at ¶ 63. Finally, Campos alleges that a 1.5 percent increase in revenue from out-of-state patients would have triggered a review of the cause of that increase under the terms of the Global Budget Agreement. *Id.* at ¶ 65. In order to avoid such an investigation, he says, Hopkins implemented the 250-350 case target, which was meant to land the increase in revenue at just under 1.5 percent. *Id.* at ¶¶ 66–67.

Campos brings three counts under the FCA based on these allegations. In Count I Campos alleges that Hopkins violated 31 U.S.C. § 3729(a)(1)(A) and (B) by making express false certifications each time it completed and submitted to CMS a Form UB-04 (CMS-1450) for payment under Medicare Part A and each time it submitted to CMS a Form 1500 for payment under Medicare Part B. *Id.* at ¶ 69. A signature on the Form 1500 certifies that the claim for payment "complies with applicable Medicare and/or Medicaid laws, regulations, and program instructions," that the signatory has provided enough information to allow the government to "make an informed eligibility and payment decision," and that all services rendered were "medically necessary." *Id.* at ¶ 70. A signature on the Form 1450 certifies that "the billing information as shown on the face of the hereof is true, accurate, and complete" and "the submitter did not . . . misrepresent or conceal material facts." *Id.* at ¶ 77. Campos alleges that Box 14 on the face of the Form 1450, which requires an inpatient admission code, was not accurate because the staff responsible for patient billing was likely to have used the waitlist priority set forth in the internal scheduling system—which was established using residency status—in filling out Box 14. *Id.* at ¶ 79.

6

In Count II Campos alleges that Hopkins violated 31 U.S.C. § 3729(a)(1)(A) and (B) by fraudulently misrepresenting its compliance with the material requirements and conditions for payment set forth in the Global Budget Agreement every time it submitted a claim for Medicare and/or Medicaid payment, approval, credit or reimbursement for hospital services. *Id.* at ¶ 82.

In Count III Campos alleges that Hopkins violated 31 U.S.C. § 3729(a)(1)(A) and (B) by falsely or fraudulently impliedly representing that its inpatient hospital services were provided pursuant to the requirements and conditions for payment set forth in 42 U.S.C. § 1395f(a)(3), including that the services were required to be given on an in-patient basis for such individual's medical treatment or that inpatient diagnostic study was required and that the services were necessary for such purpose. *Id.* at ¶ 85.

On July 31, 2017, Campos filed an initial sealed complaint on behalf of the United States of America and the State of Maryland under both the FCA and the Maryland False Claims Act. ECF No. 1. On November 21, 2017, both the United States and the State of Maryland declined to intervene. ECF No. 8. Pursuant to the Maryland False Claims Act, the State's decision triggered dismissal of those claims brought on its behalf. ECF No. 9. On December 13, 2017, Campos filed an amended complaint alleging on behalf of the United States the three violations of the FCA described above. ECF No. 10. On January 31, 2018, Hopkins filed a motion to dismiss the amended complaint for failure to state a claim. ECF No. 21. Campos responded to that motion and requested a hearing. ECF Nos. 22–23. Hopkins replied. ECF No. 24. On April 17, 2018, the court heard oral argument on the motion.

## STANDARD

"The purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v.*

7

*City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir.1999) (internal quotation marks and alterations omitted). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (internal citations omitted). Thus the plaintiff's obligation is to set forth sufficiently the "grounds of his entitlement to relief," offering more than "labels and conclusions." *Id.* (internal quotation and alterations omitted); *see Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001) ("the presence [in a complaint] ... of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support" the necessary legal finding).

Because an FCA claim is a type of fraud claim, it is also subject to the heightened pleading standard of Rule 9(b). *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783–84 (4th Cir. 1999). To meet the 9(b) standard, "an FCA plaintiff must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. These facts are often referred to as the who, what, when, where, and how of the alleged fraud." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (internal citations omitted). Fraud allegations that fail to comply with Rule 9(b) warrant dismissal under Rule 12(b)(6). *Harrison*, 176 F.3d at 783 n.5.

## ANALYSIS

Each of the counts in the amended complaint alleges violation of 31 U.S.C. § 3729(a)(1)(A) and (B), two provisions of the FCA. Subsection (A) imposes liability on "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Subsection (B) imposes liability on "any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). To establish a claim for a violation of these provisions, a plaintiff must prove "(1) that [defendant] made a false statement or engaged in a fraudulent course of conduct; (2) that such statement or conduct was made or carried out with the requisite scienter; (3) that the statement or conduct was material; and (4) that the statement or conduct caused the government to pay out money or to forfeit money due." *United States ex rel. Owens v. First Kuwaiti General Trading & Contracting Co.*, 612 F.3d 724, 728–29 (4th Cir. 2010); *see also Harrison*, 176 F.3d at 788.

Campos's complaint must be dismissed because it fails to allege that Hopkins made a false statement or engaged in a fraudulent course of conduct. Simply put, the Global Budget Agreement did not prohibit Hopkins from engaging in a scheme to prioritize out-of-state patients. Therefore, Hopkins committed no fraud when it represented to CMS that it was complying with the Global Budget Agreement. The complaint also fails to meet the heightened pleading standard of Rule 9(b), which provides an alternative ground for dismissal.

### I. The Complaint Does Not Identify a False Statement

The fundamental reason the complaint must be dismissed is that it fails to plausibly allege that Hopkins made a false statement or engaged in a fraudulent course of conduct. "To satisfy th[e] first element of an FCA claim, the statement or conduct alleged must represent an objective

9

falsehood." *Wilson*, 525 F.3d at 376. The complaint points to a number of supposedly false statements made by Hopkins. First, that they complied with "the material requirements and conditions for payment set forth in the Global Budget Agreement." ECF No. 10, ¶ 82. Second, that they complied with "applicable Medicare and/or Medicaid laws, regulations, and program instructions." *Id.* at ¶ 70. Third, that in submitting the Form 1500's they "provided enough information to allow the government to 'make an informed eligibility and payment decision.'" *Id.* Fourth, that all services they rendered were "medically necessary." *Id.* Fifth, that "the billing information as shown on the face of [the Form 1450's] [wa]s true, accurate, and complete." *Id.* at ¶ 77. Sixth, that in submitting the Form 1450's they "did not . . . misrepresent or conceal material facts." *Id.* Seventh, that their inpatient hospital services were "required to be given on an in-patient basis for [each] individual's medical treatment or that inpatient diagnostic study was required and that the services were necessary for such purpose." *Id.* at ¶ 85.

Campos alleges that each of these seven statements was false for the same reason. Namely, Hopkins engaged in a scheme to prioritize out-of-state patients, which violated the material terms of the Global Budget Agreement by depriving Maryland residents of services that Hopkins had been paid to provide pursuant to the annual budget cap, and led Hopkins to provide unnecessary medical services to out-of-state patients. ECF No. 22, pp. 27, 30. The problem with this argument is (1) Campos cannot point to a single material term of the Global Budget Agreement that Hopkins violated and (2) Campos cannot point to a single out-of-state patient who was provided unnecessary medical services, or a single Maryland patient who was denied medical services.

Campos argues that Hopkins violated three separate provisions of the Global Budget Agreement. Campos's complaint focused primarily on the alleged violation of the

10

only provision of the Global Budget Agreement that actually discusses the mix of in-state and out-of-state patients. ECF No. 10, ¶¶ 26, 64. That provision reads:

> Significant changes in out-of-state volume and volumes from outside an individual Hospital's PSA and SSA have the potential to positively or negatively affect the success of the GBR Model. In FY 2013, approximately 17.97 percent of the Hospital System's total revenue came from non-Maryland residents. If this percentage changes materially during the term of this Agreement, the HSCRC staff and the Hospital will evaluate the causes of the change to ensure that the goals and objectives of this Agreement, the GBR model and the final contract between CMMI and the State of Maryland are not being undermined by such changes. ECF No. 10-3, p. 14.

This provision plainly *does not* prohibit solicitation of out-of-state clients. In fact, it says that "significant changes in out-of-state volume . . . have the potential to *positively or negatively* affect the success of the GBR Model." *Id.* (emphasis added). It clearly envisions that such changes may occur, and says they will be evaluated if they do. Nothing in this provision indicates that the percentage of out-of-state patients is fixed or that an increase in that percentage would amount to depriving Maryland residents of services that Hopkins had already been paid to provide pursuant to the annual budget cap. Simply put, this provision—the only provision in the Global Budget Agreement that discusses the treatment of out-of-state patients—*envisions* that Hopkins might take on more out-of-state patients. It does not prohibit it.

Perhaps recognizing this, in his opposition to the motion to dismiss, Campos switched his focus to two other provisions. One, a provision within the "Overview" section, reads:

> In accepting this Agreement, each JHHS Hospital agrees to operate within the GBR's financial constraints and to comply with the various patient-centered and population-focused performance standards that have been or will be established by the HSCRC . . . . ECF No. 10-3, p. 4.

This provision says nothing about out-of-state patients. And Campos fails to connect the dots and explain how a scheme to prioritize out-of-state patients amounts to failure to "operate within the

11

GBR's financial constraints" or to "comply with the various patient-centered and population-focused performance standards that have been or will be established by the HSCRC."

The other is a provision within a subsection entitled "Case Mix/Severity Levels," which reads:

> The HSCRC will pay close attention to the overall case mix and the severity levels within DRGs at each Hospital. If requested, the Hospital will demonstrate to the HSCRC that any reductions in its case mix index or its severity levels are not the result of deliberate efforts by the Hospital to deny, for inappropriate financial reasons, any services to particular patients, or treatments for particular conditions that fall within the scope of the medical capabilities of the Hospital and its attending medical staff. ECF No. 10-3, p. 10.

Again, this provision says nothing about out-of-state patients. And Campos fails to explain how a scheme to prioritize out-of-state patients has anything to do with reduction in "case mix index" or "severity levels," each of which has to do with the severity of patients' conditions rather than their place of residence. Campos argues that "nowhere in the plain language of the 'Case Mix/Severity Levels' section of the agreement does it state that geographical status is excluded from consideration of a hospital's case mix . . . ." ECF No. 22, p. 15. However, Hopkins points out that case-mix index "represents the average diagnosis-related group ("DRG") relative weight for that hospital," *see* https://www.cms.gov/medicare/medicare-fee-for-service-payment/acuteinpatientpps/acute-inpatient-files-for-download-items/CMS022630.html (last visited April 18, 2018), and that DRG is assigned based on "the patient's age, sex, principal diagnosis . . . secondary diagnoses, procedures performed, and discharge status." 42 C.F.R. § 412.60(c)(1)–(2). In other words, geographical status has nothing to do with a hospital's case mix. Therefore, this provision simply cannot be read to limit Hopkins's ability to alter its percentage of out-of-state patients.

Finally, although Campos alleges that out-of-state patients received priority, he is unable to point to a single out-of-state patient that received "unnecessary" medical services. He says his argument:

> rests on the premise that if the primary factor for administering healthcare is residency status, and not something more clinically objective, such as medical necessity, urgency, or otherwise, then it follows that at least some of the services provided were *not medically necessary*, but instead, simply profitable because the patient lived outside of Maryland.

ECF No. 22, p. 27. This argument is flawed for two reasons. First, it rests on a faulty premise. Campos alleges that some out-of-state patients were seen more quickly, not that the "primary factor for administering healthcare is residency status." Second, and more importantly, even assuming this premise were true, it *does not* follow that any patient received services that were not ultimately necessary.

The court understands Campos is frustrated that Hopkins recruited out-of-state patients while operating under an agreement that was expressly focused on Maryland patients. The fact of the matter, however, is that the Global Budget Agreement did not prohibit such behavior and indeed even recognized it might "positively" affect the success of the GBR model. Therefore, Hopkins neither made a false statement nor omitted a material fact when it represented to CMS that it was complying with the Global Budget Agreement. For this reason, Campos's FCA claim must be dismissed.

## II. The Complaint Does Not Meet the Heightened Pleading Standard of Rule 9(b)

The complaint also fails to meet the heightened pleading standard of Rule 9(b), which provides an alternative ground for dismissal. Under Rule 9(b) "an FCA plaintiff must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. These facts

13

are often referred to as the who, what, when, where, and how of the alleged fraud." *Wilson*, 525 F.3d at 379 (internal citations omitted).

Rule 9(b) has four purposes. First, to "ensure[] that the defendant ha[d] sufficient information to formulate a defense by putting it on notice of the conduct complained of." *Harrison*, 176 F.3d at 784. Second, to "protect defendants from frivolous suits." *Id.* Third, "to eliminate fraud actions in which all the facts are learned after discovery." *Id.* Fourth, to "protect[] defendants from harm to their goodwill and reputation." *Id.*

The heightened pleading standard plays a particularly important role in *qui tam* actions, where the plaintiff, "who has suffered no injury in fact, may be particularly likely to file suit as a pretext to uncover unknown wrongs." *Owens*, 612 F.3d at 731–32 (internal citation and quotation marks omitted). In light of this, the Fourth Circuit recently clarified that "when a defendant's actions, as alleged and as reasonably inferred from the allegations, *could* have led, but *need not necessarily* have led, to the submission of false claims, a relator must allege with particularity that specific false claims actually were presented to the government for payment." *United States ex rel. Nathan v. Takeda Pharmaceuticals North America, Inc.*, 707 F.3d 451, 457 (4th Cir. 2013).

Campos's complaint fails under *Takeda* because he alleges a scheme that need not necessarily have led to the submission of false claims and fails to identify particular false claims that were actually presented. Campos alleges that because there was a fraudulent scheme in place, *every* claim presented to CMS between Spring 2015 and the time he filed his complaint was false. ECF No. 22, pp. 11–12. Even under his theory, however, this is not possible.

Take just one obvious example: Campos claims that Hopkins lied on every Form 1450 by certifying that "the billing information as shown on the face of the hereof is true, accurate, and

14

complete" and "the submitter did not . . . misrepresent or conceal material facts." ECF No. 10, ¶¶ 77–78. Box 14 asks for the patient's "admission code." *Id.* at ¶ 79. Campos alleges that this information would have been inaccurate if the employees who filled out Box 14 looked to the patient's "waitlist priority" when determining his or her "admission code." *Id.* This is so, Campos says, because each patient's "waitlist priority" was determined by his or her residency status rather than by clinical necessity. ECF No. 10, ¶ 50. Specifically, in-state residents were assigned "Low Priority" whereas out-of-state patients were assigned "Normal Priority." *Id.* Only patients with an urgent diagnosis, regardless of residence, were assigned "High Priority." *Id.*

Even assuming Campos's allegations are true, not every Box 14 was inaccurate. For starters, "High Priority" patients' "waitlist priority" was not affected by residency status. Therefore, even under Campos's theory, Box 14 of the Form 1450 for those patients was not false. Further, certain in-state residents must have actually been "low priority" patients, just as certain out-of-state residents must have actually been "normal priority" patients. Even under Campos's theory, Box 14 of the Form 1450 for those patients was not false. This is just one example of how, even under Campos's theory, many of the claims presented to CMS between Spring 2015 and the time he filed his complaint were not false.

Campos seemingly recognizes that he is unable to identify particular false claims. He defends this inability by arguing that "when Hopkins makes available all of the patient records, if it is deemed necessary, the Relator will be in a position to identify all of the patients provided services based on out-of-state residency, as well as those identically situated in-state patients who were denied equal access to needed services." ECF No. 22, p. 12. This approach is precisely what Rule 9(b), as interpreted by *Takeda*, prohibits. Rule 9(b) is meant to ensure that there is substantial evidence *prior to discovery*, in light of the *qui tam* plaintiff's particular incentive to

15

file suit as a pretext for a fishing expedition. *See Owens*, 612 F.3d at 731–32. Recognizing that this may be a tough pill for such plaintiffs to swallow, the Fourth Circuit said the following:

> In reaching this conclusion, we acknowledge the practical challenges that a relator may face in cases such as the present one, in which a relator may not have independent access to records such as prescription invoices, and where privacy laws may pose a barrier to obtaining such information without court involvement. Nevertheless, our pleading requirements do not permit a relator to bring an action without pleading facts that support all the elements of a claim. We further emphasize, however, that the standard we articulate today does not foreclose claims under the Act when a relator plausibly pleads that specific, identifiable claims actually were presented to the government for payment.

*Takeda*, 707 F.3d at 458 (internal citation omitted). Here Campos has not pled that specific, identifiable claims actually were presented to the government for payment. Accordingly, the complaint fails to meet the heightened pleading standard of Rule 9(b), which provides an alternative ground for dismissal.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss will be granted. Campos did not seek leave to further amend his complaint nor suggest any way he could successfully do so. Accordingly, this case will be dismissed with prejudice. A separate order follows.

4/24/18
Date

/s/ CCB
Catherine Blake
United States District Judge